UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL VELTKAMP,

       Plaintiff,                                       Hon. Richard Alan Enslen

v.                                                           Case No. 1:06-CV-295

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.

_____/

### REPORT AND RECOMMENDATION

This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for the awarding of benefits**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

### PROCEDURAL POSTURE

Plaintiff was 62 years of age at the time of the ALJ's decision. (Tr. 14). He attended college for several years and worked previously as a service representative and carpenter. (Tr. 14, 65, 80-82, 196).

Plaintiff applied for benefits on August 8, 2003, alleging that he had been disabled since July 1, 2002, due to bi-polar disorder. (Tr. 47-49, 62, 64). Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 20-46). On July 5, 2005, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, Sharon Princer. (Tr. 192-234). In a written decision dated December 16, 2005, the ALJ determined that Plaintiff was not disabled. (Tr. 13-19). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-7). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2003. (Tr. 14, 60-61); *see also*, 42 U.S.C. § 423(c)(1). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that he became disabled prior to the expiration of his insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **MEDICAL HISTORY**

On December 26, 1984, Plaintiff voluntarily checked himself into Pine Rest Christian Hospital complaining of "mild hypomanic behaviors with reduced sleep, hyperactivity, inappropriate behavior, and difficulty concentrating at work." (Tr. 126-29). Plaintiff expressed "ambivalence about being in the hospital" and "had difficulty accepting problems or a need for help and did try to minimize and deny much of the time." (Tr. 124). Plaintiff "resisted" therapy and "remained aloof for the majority of his stay." Plaintiff was discharged on January 30, 1985. (Tr. 122-25). Plaintiff was diagnosed with cyclothymic disorder and "evidence of narcissistic personality traits." (Tr. 125). Plaintiff was prescribed lithium. (Tr. 124-25).

On December 2, 2003, Plaintiff was examined by a limited licensed psychologist and a licensed psychologist.[1] (Tr. 138-43). Plaintiff reported that he was suffering from bi-polar disorder. (Tr. 138). He reported that he was presently taking Wellbutrin and that he had previously taken Lithium, Haldol, and Xanax with mixed results. *Id.* Plaintiff reported that on a typical day he searches for lawn mower parts at a junk yard, repairs lawn mowers, performs yard work, reads, and watches television. (Tr. 140). Plaintiff reported that he "has never had a real friend in his life." (Tr. 139). He reported that while he "can get along with other people," he "does not have a lot of interaction with other people" and "would rather be alone." (Tr. 139).

The examiners reported that during their examination, Plaintiff began crying for no apparent reason. (Tr. 141). The examiners further observed that

> It was difficult to get information from [Plaintiff] because he would go off on tangents about various things. When asked how long his first marriage lasted, he got off into all kinds of different things then

---

[1] The examiners' signatures are illegible and their identity is not revealed elsewhere in the record.

>ended up with something about sitting on the couch and feeling like his mind was made of butter, and there was a warm butter knife (not hot, not cold, but warm) just slicing through it from the weight. When the butter knife went through the brain, he thinks there was a bunch of damage. It was quite frustrating trying to ask him questions because he would get so far off the topic. . .Paul related several instances in the course of his "stories" that would be indicative of hallucinations, and delusionary. He rambled on and on about different things.

Plaintiff reported that he attempted suicide five times in the "late 1980s." Plaintiff reported that "he can distinguish between thinking about suicide and attempting suicide." Plaintiff further observed, however, that "he sometimes wants to kill himself, but he knows he is not very good about it." *Id.* In conclusion, the examiners reported that

>The examination took over 1 hour and 45 minutes when it should have only taken 45 minutes to an hour. Paul's emotions sort of ran the gambit. Sometimes he was laughing, and other times he was crying. He was sometimes serious, and sometimes seemed light hearted. He was quite odd. He would sometimes sort of stare "through" you. He was able to remain seated. He was sometimes easily excitable by some of his stories, especially when speaking about government or religion. He was cooperative. I did not believe him to be exaggerating his symptoms.

(Tr. 142).

Plaintiff was diagnosed with bi-polar disorder and schizotypal personality disorder. (Tr. 143). Plaintiff's prognosis was characterized as "poor" and his GAF score was rated as 48.[2] *Id.*

December 17, 2003, James Tripp, Ed.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 150-63). Determining that Plaintiff suffered from

---

[2] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereinafter DSM-IV). A GAF score of 48 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34.

bi-polar disorder and a personality disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.08 (Personality Disorders) of the Listing of Impairments. (Tr. 151-59). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular impairments. (Tr. 160). Specifically, the doctor concluded that Plaintiff suffered no restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and experienced "one or two" episodes of decompensation, each of extended duration. *Id.*

Dr. Tripp also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 145-47). Plaintiff's abilities were characterized as "moderately limited" in four categories. With respect to the remaining 16 categories, however, the doctor reported that Plaintiff was "not significantly limited." *Id.*

On June 22, 2005, and June 27, 2005, Plaintiff was examined by licensed psychologist, Donna LaMar, Ph.D. (Tr. 164-70). Plaintiff reported that he was suffering from bi-polar disorder. (Tr. 165). He reported experiencing psychological difficulty since childhood. *Id.* Plaintiff reported experiencing "periods of lows with almost total immobilization and then something changes in his brain chemistry and this mood may lift in five minute[s] or three days." (Tr. 168). Plaintiff reported that he had taken various medications, none of which proved effective for more than brief periods of time. (Tr. 165). He reported that "he is not currently taking any medications because they don't work." Plaintiff also indicated that he had been diagnosed with prostate cancer, only to later in the examination deny having cancer. *Id.*

6

Plaintiff reported that he "cannot deal with people" and is a "loner." (Tr. 166). He reported that "because it is so hard for him to be with people, he'd rather be alone and he avoids interpersonal relationships." Plaintiff indicated that he could "talk to one or two individuals, but more than that he becomes nervous." However, Plaintiff later stated that "he could talk to 100's or 1000's of people without a problem." *Id.* Dr. LaMar observed that Plaintiff exhibited evidence of "thought disorder and hallucinations." (Tr. 167). The doctor further observed that

> The client was not able to focus on every task presented to him with normal focus and attention. Problems with impulse control as well as decision making skills were noted. The client cried at times when relating memories. . .He worked to answer all questions, however, he was easily distracted from the presenting question and would forget the focus. . .This client, on one level, is aware of not always being in reality, on another level, he does not have this awareness. He is aware that his reality is different from the reality of others and struggles with this. . .He would also go off in tangents, speaking with great intensity. At times, when he started talking about a particular subject/event, his thought pattern would be well organized, however, he would then lose his focus and begin talking about things that appeared to come from an internal direction. For example, in one description he began answering a question, but then began to talk about a psychotic episode. In this episode he described the split in his brain like a warm knife going through butter. This pattern was repeated often. Toward the end of the interview the client made a concerted effort to answer the questions asked, but was only able to stay focused occasionally.

*Id.*

Dr. LaMar reported that Plaintiff "related several instances indicative of visual hallucinations as well [as] a thought disorder." (Tr. 168). The doctor concluded that

> The diagnostic interview took almost two hours; the norm is around forty-five minutes. The MMPI-II took the client less than half the average amount of time. The client related being depressed, anxious, and wanting and needing someone to understand what has happened to him. He demonstrated a range and fluctuation of emotions from

7

>happiness to sadness with tears. He obsessed with some issues in his life. He feels persecuted by others and is afraid of others. . .He has highs and lows. He is also exhausted from the battle of trying to keep going and keep himself together. He'd like to escape or fix his situation, but can't. He has visual hallucinations and thought disorder. This testing also indicated an attention and concentration problem. He has seriously contemplated suicide in the past.

*Id.*

Dr. LaMar diagnosed Plaintiff with bipolar disorder, major depressive disorder, and schizotypal personality disorder. (Tr. 169). Plaintiff's prognosis was characterized as poor and his GAF score was rated as 40-45.[3] *Id.*

On June 29, 2005, Dr. LaMar completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 172-78). The doctor determined that Plaintiff suffered from: (1) psychological or behavioral abnormalities associated with a dysfunction of the brain; (2) delusions or hallucinations; (3) emotional withdrawal and/or isolation; (4) disturbances of mood, accompanied by a full or partial manic or depressive syndrome; (5) generalized persistent anxiety; and (6) inflexible and maladaptive personality traits which cause either significant impairment in social or occupation functioning or subjective distress. (Tr. 172-76). Accordingly, the doctor concluded that Plaintiff satisfied the Part A criteria for the following portions of the Listing of Impairments: (1) Section 12.02 (Organic Mental Disorders); (2) Section 12.04 (Affective Disorders); (3) Section 12.06 (Anxiety-Related Disorders); and (4) Section 12.08 (Personality Disorders). *Id.* Dr. LaMar further determined that Plaintiff satisfied the Part B criteria for these particular

---

[3] A GAF score of 48 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." DSM-IV at 34. A GAF score of 40 indicates that the individual is experiencing "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

impairments. (Tr. 177). Specifically, the doctor concluded that Plaintiff suffered marked restrictions in the activities of daily living, extreme difficulties in maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and experienced "four or more" episodes of decompensation, each of extended duration. *Id.*

Dr. LaMar also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 171). Plaintiff's abilities were characterized as "moderately limited" in six categories. His abilities were characterized as "markedly limited" in eleven categories. With respect to the remaining three categories, the doctor reported that there existed "no evidence of limitation." *Id.*

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

9

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

**B. The ALJ's Decision**

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) affective disorder; and (2) personality disorder. (Tr. 16). The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.*

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work activities "at any level of exertion from sedentary to very heavy" that involves simple repetitive tasks. (Tr. 18). A vocational expert testified that if limited to the extent recognized by the ALJ, Plaintiff could still perform his past relevant work as a handyman and service representative. (Tr. 230-32). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Not Supported by Substantial Evidence

A claimant's RFC represents his ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996); *see also*, *Shaw v. Apfel*, 220 F.3d 937, 939 (8th Cir. 2000) (same); *Lanclos v. Apfel*, 2000 WL 1054893 at *3, n.3 (9th Cir., July 31, 2000) (same); *Moore v. Sullivan*, 895 F.2d 1065, 1069 (5th Cir. 1990) (to properly conclude that a claimant is capable of performing work requires "a determination that the claimant can *hold* whatever job he finds for a significant period of time").

As detailed above, the psychologists who have over the years examined Plaintiff have consistently reported that he suffers from bi-polar disorder. The ALJ's failure to recognize that Plaintiff suffers from such is not supported by substantial evidence. Plaintiff's care providers have consistently reported that Plaintiff experiences mood swings, hallucinations, and thought disorders, as well as an inability to sustain concentration or focus for any significant period of time. Plaintiff's GAF score has consistently been rated as ranging from 40-48, consistent with "serious" to "major"

impairment in the ability to function. The ALJ's RFC determination is utterly inconsistent with the findings and opinions of Plaintiff's treating physicians and other evidence of record.

In support of his decision, the ALJ identifies several items none of which are persuasive or supported by substantial evidence. First, the ALJ disregarded Plaintiff's assertion that his mental impairments are disabling in nature because "at the hearing [Plaintiff] was clean and neat, well behaved, and he spoke well." (Tr. 17). While Plaintiff's appearance is not irrelevant when assessing his mental state, the mere fact that Plaintiff was reportedly polite, presentable, and spoke clearly hardly constitutes persuasive evidence of a lack of disabling mental illness.

The ALJ also found significant Plaintiff's "spotty history" of treatment for his mental illness. *Id.* While the ALJ is not necessarily incorrect that Plaintiff "has an inconsistent treatment record," a closer examination of the issue is necessary. At the administrative hearing Plaintiff testified that he has been unable to obtain treatment consistently because he lacks insurance or other means to pay for such. (Tr. 215-20). Plaintiff also reported that one of the reasons he has often not sought treatment was because he "don't want to" and that he only recently "accepted" that he suffers from manic depression. (Tr. 214, 220).

These latter statements by Plaintiff are significant given that one of the symptoms of bi-polar disorder is that the sufferer often fails to discern or acknowledge the existence of the illness and, therefore, declines or fails to recognize the need for treatment. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 401 (4th ed. 2000) (recognizing that sufferers of bi-polar disorder may not view their symptoms as "pathological"); Bipolar Disorder, *available at* http://www.nimh.nih.gov/publicat/bipolar.cfm (last visited on August 10, 2007) (recognizing that one of the many symptoms of bi-polar disorder is the "denial that anything is

wrong"); Psychiatry Update: American Psychiatric Association Annual Review - vol. 6 112 (American Psychiatric Pub., Inc. 1987) (recognizing that non-compliance with treatment "is the major clinical problem encountered by most clinicians who treat manic-depressive patients"); Herbert Wagemaker, M.D. and Ann Buchholz, Schizophrenia and Bipolar Disorders 85 (Ponte Vedra Publishers 1996) (observing that "[p]robably the most difficult struggle" in the treatment of bi-polar disorder is obtaining the patient's compliance with treatment and medication directives). Plaintiff's failure, therefore, to consistently seek treatment may not be as significant as the ALJ determined. *See, e.g., DeLeon v. Secretary of Health and Human Services*, 734 F.2d 930, 934 (2d Cir. 1984) (observing that a claimant's "refusal to obtain treatment for [mental illness] is not necessarily probative").

The only evidence in the current record which supports the ALJ's RFC determination is the December 17, 2003 reports completed by Dr. Tripp. (Tr. 145-63). It must be recognized, however, that Dr. Tripp never examined Plaintiff, but instead merely reviewed the then existing medical record. The vast majority of the medical evidence in this case, however, dates from *after* December 17, 2003. Furthermore, while the Court recognizes that records reviewers such as Dr. Tripp are medical professionals whose opinions are entitled to serious consideration, the persuasiveness of such may be diminished in cases involving mental illness.

Considered and persuasive opinions regarding *physical* ailments can often be rendered by simply reviewing a claimant's medical history, as such usually contains a significant amount of objective medical evidence (e.g., the results of diagnostic examinations and laboratory tests). However, when the claimant suffers from mental illness the medical record may contain precious little objective medical evidence and instead may consist primarily of the subjective observations

of the claimant's care providers. Such is certainly the case here. In such circumstances the ability to actually observe and speak with the claimant, in the Court's estimation, assumes an added significance. Thus, the Court finds the ALJ's almost exclusive reliance on Dr. Tripp's opinions to be misplaced and not supported by substantial evidence.

In sum, the ALJ's RFC determination is not supported by substantial evidence. Plaintiff's care providers have consistently concluded that Plaintiff suffers from a severe mental illness, the seriousness of which impairs him to an extent well beyond that recognized by the ALJ. This conclusion is supported by the observations and opinions of Plaintiff's care providers, as well as Plaintiff's testimony and reported activities.

As previously noted, the vocational expert testified that if limited to the extent recognized by the ALJ, Plaintiff could still perform his past relevant work as a handyman and service representative. However, the ALJ's RFC determination is not supported by substantial evidence. In short, therefore, the hypothetical questions, the response to which the ALJ relied upon to support his decision, was based upon an improper RFC determination. Accordingly, the ALJ's conclusion that Plaintiff can perform his past relevant work despite his limitations, is supported by less than substantial evidence. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

b. Evidence of Plaintiff's Disability is Compelling

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of his disability is "compelling." *Faucher*

14

*v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and immediately award benefits if all essential factual issues have been resolved and proof of disability is compelling).

The vocational expert testified that if Plaintiff were limited to the performance of unskilled work and was "unable to keep a regular schedule" due to "occasionally" experiencing "lack of focus and up and down mood," he could neither perform his past relevant work nor any other work which existed in significant numbers. (Tr. 232-33). As the medical evidence detailed above reveals, Plaintiff "occasionally" experiences "lack of focus and up and down mood." The vocational expert's testimony, therefore, constitutes compelling evidence of Plaintiff's disability.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision does not conform to the proper legal standards and is not supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for the awarding of benefits**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Date:  August 15, 2007                                         /s/ Ellen S. Carmody                    
                                                                                  ELLEN S. CARMODY
                                                                                  United States Magistrate Judge